Timothy JANOWIAK,
Plaintiff–Appellant,

v.

The **CORPORATE CITY OF SOUTH BEND**, et al., Defendants–Appellees.

No. 84–1321.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1984.

Decided Dec. 6, 1984.

Rehearing and Suggestion for Rehearing En Banc Denied March 11, 1985.

On Remand from the United States Supreme Court
Decided Dec. 16, 1987.

As Amended Dec. 21, 1987
and Jan. 5, 1988.

Rehearing and Rehearing En Banc Denied Feb. 23, 1988.

Patrick T. McFadden, McFadden & McFadden, South Bend, Ind., for plaintiff-appellant.

Thomas L. Bodnar, South Bend, Ind., for defendants-appellees.

Before BAUER, Chief Judge, PELL, Senior Circuit Judge, and DUPREE, Senior District Judge.*

BAUER, Chief Judge.

We again face the question whether the City of South Bend, Indiana (the City) could adopt an affirmative action program for its police and fire departments based solely upon a finding that a disparity existed between the percentage of minorities in the City's population and the percentage of minorities in the departments. The district court granted summary judgment to defendants-appellees, the City and various municipal agencies and officers, holding that the City's proffered statistical comparison justified its affirmative action program. 576 F.Supp. 1461 (N.D.Ind.1983). We reversed. 750 F.2d 557 (7th Cir.1984). The Supreme Court granted the City's petition for a writ of certiorari, vacated our judgment, and remanded for further consideration in light of *Johnson v. Transportation Agency*, 480 U.S. ——, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) and *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). Again, we reverse the district court.

## I.

During a June 20, 1979 meeting, the City's Board of Public Safety (the Board) appointed a task force to design and implement a plan to improve the recruitment of minorities for the City's police and fire departments. The Board noted that the percentage of minorities in the City's population was 14.1 percent and the percentage of minorities in the fire department was approximately 5.3 percent.

The Minority Recruitment Task Force (the Task Force) submitted its report to the Board on January 29, 1980. In the report, the Task Force emphasized that the Board's existing hiring standards were reasonable and advocated continued use of those standards.[1] The Task Force recommended, however, that the Board adopt a preferential hiring plan to reflect, within five years, the minority composition of the city.

A Minority Recruitment Review Committee (the Committee) then reviewed both the Board's hiring procedures and the Task Force's report and presented its own report and recommendation to the Board. The Committee's report noted the disparity between the percentage of minorities in the police and fire departments and the percentage of minorities in the City. Although the Committee determined that the Board's testing standards were reasonable and should be retained, it recommended that the departments utilize separate lists to rank minority and nonminority applicants who achieved a certain base score on the hiring test. A three-member panel would then recommend the number of applicants the Board should hire from each list.

The Board adopted the Committee's recommendations in June, 1980 and, consistent with the affirmative action program, ap-

---

* The Honorable Franklin Taylor Dupree, Jr., Senior Judge of the United States District Court for the Eastern District of North Carolina, is sitting by designation.

1. Indeed, the Task Force chairman, in a preliminary report to the Board, stated that the Task Force did not find the Board's hiring procedures discriminatory. The Task Force in its final report to the Board stressed that although minorities requested twenty-eight percent of the applications for fire department positions, only nine percent of those applications were returned. Nonminorities returned their applications at a rate of thirty-seven percent.

pointed four minority applicants and one nonminority applicant to the fire department in November, 1980. Although one minority hiree failed the required physical examination, the Board replaced him with the next applicant on the minority hiring list in February, 1981.

Plaintiff-appellant Janowiak ranked second of the twenty-two applicants on the fire department's nonminority hiring list. After Janowiak learned in February, 1981 that he would not be hired as a firefighter, he filed a charge of race discrimination with the Equal Employment Opportunity Commission, which issued a right-to-sue letter in February, 1982. Janowiak then brought suit in the district court, which granted defendants' motion for summary judgment. The district court, after finding that the statute of limitations did not bar plaintiff's action,[2] held that summary judgment was proper because neither Title VII nor the fourteenth amendment prohibited adoption of an affirmative action program designed to remedy the disparity between the percentage of minorities in the City's population and the percentage of minorities in the fire department. We reversed, holding that the statistical comparison proffered by the City to support the affirmative action program, without more, did not show the predicate past discrimination required to justify such a program under either Title VII or the fourteenth amendment. The Supreme Court granted the City's petition for a writ of certiorari, vacated our judgment, and remanded for further consideration in light of *Johnson* and *Wygant.*

## II.

Summary judgment is appropriate when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the burden of persuading the court that no issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *see Herman v. National Broad-*

casting Co., 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1393, 84 L.Ed.2d 782 (1985). In determining whether an issue of material fact exists, the court must construe the facts alleged in the light most favorable to the party opposing the motion for summary judgment. *Id.; see Trulson v. Trane Co.,* 738 F.2d 770, 771 (7th Cir.1984). Upon review of a summary judgment, we must consider the entire record in the same light. *Cedillo v. International Assoc. of Bridge & Iron Workers,* 603 F.2d 7, 11 (7th Cir. 1979).

Initially, we note that Janowiak bears the burden of establishing the invalidity of the City's plan. Under the framework approved by the Court in *Johnson,*

> [o]nce a plaintiff establishes a prima facie case that race or sex has been taken into account in an employer's employment decision, the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision. The existence of an affirmative action program provides such a rationale. If such a plan is articulated as the basis for the employer's decision, the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid. As a practical matter, of course, an employer will generally seek to avoid a charge of pretext by presenting evidence in support of its plan.... The burden of proving its invalidity [however,] remains on plaintiff.

*Johnson,* 107 S.Ct. at 1449 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). It is undisputed that the City took into account race in its fire department hiring decisions and that it has asserted its affirmative action plan as the rationale for those decisions. We thus consider, with *Johnson* and *Wygant* in mind, whether the district court should have concluded as a matter of law that the City did not violate Title VII or the fourteenth amendment when it adopted its affirmative action plan in response to a statistical disparity between

---

2. We do not discuss this issue on remand.

**1037**

the percentage of minorities in the fire department and the percentage of minorities in the City's population.

In *Johnson,* the Supreme Court held that the Transportation Agency of Santa Clara County, California did not violate Title VII[3] by considering the sex of qualified employee applicants as one factor in making a promotion decision. *Johnson,* 107 S.Ct. at 1457. Paul Johnson and Diane Joyce were two of seven Santa Clara County employee applicants who achieved the required minimum test score for promotion to a road dispatcher position.[4] *Id.* at 1447–48. Joyce received the promotion pursuant to a county affirmative action plan designed to achieve long-range parity between the percentage of women and minorities in the county work force and the percentage of women and minorities in the area labor pool. *Id.* In finding Santa Clara County's affirmative action plan permissible under Title VII, the Court held that an employer need not point to its own past discriminatory practices, nor even to evidence of an arguable Title VII violation on its part, to justify a voluntary affirmative action program; rather, the employer need only show the existence of a "manifest imbalance" in a traditionally segregated job category. *Id.* at 1451 (citing *Steelworkers v. Weber,* 443 U.S. 193, 209, 212, 99 S.Ct. 2721, 2730, 2731, 61 L.Ed.2d 480 (1979)). Once an employer justifies its affirmative action plan by establishing the existence of such a manifest imbalance, its plan passes Title VII muster so long as it does not "unnecessarily trammel" the rights of nonminorities. *Id.* 107 S.Ct. at 1452.

According to the *Johnson* majority, to determine whether a manifest imbalance exists to justify an affirmative action plan,

a comparison of the percentage of minorities or women in the employer's work force with the percentage in the area labor market or general population is appropriate in analyzing jobs that require no special expertise, or training programs designed to provide expertise. Where a job requires special training, however, the comparison should be with those in the labor force who possess the relevant qualifications.

*Id.* at 1452 (citations omitted).[5] This suggests that the relevant statistical comparison in *Johnson* was between the number of women in the county's skilled craft positions, which included the road dispatcher position, and the number of women in the local labor pool of skilled craft workers. The Court, however, never explicitly made that comparison. Instead, it merely pointed out that in the county's skilled craft job category, *none* of the 238 positions was occupied by a woman.[6] "Given the obvious imbalance in the Skilled Craft category, and given the Agency's commitments to eliminating such imbalances, it was plainly

3. Petitioner in Johnson raised only a Title VII (and not a fourteenth amendment) challenge to the affirmative action plan. Section 703(a) of the Civil Rights Act of 1964, 78 Stat. 255, as amended, 86 Stat. 109, 42 U.S.C. § 2000e–2(a), provides that it "shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

4. Johnson's test score of 75 tied him for second among the seven candidates. Joyce's 73 was the fourth best score.

5. The *Johnson* majority stated explicitly that the statistical proof required to establish a manifest imbalance need not be enough to establish a Title VII prima facie case of discrimination against the employer, *Johnson,* 107 S.Ct. at 1452, as suggested by Justice O'Connor in her separate opinion, *Johnson,* 107 S.Ct. at 1463 (O'Connor, J., concurring).

6. Justice O'Connor, in her concurrence, however, found that because Johnson had conceded that "women constituted approximately 5% of the local labor pool of skilled craft workers in 1970 ... the statistical disparity would have been sufficient for a prima facie Title VII case brought by unsuccessful women job applicants," *Johnson,* 107 S.Ct. at 1465, the showing she would require. *Id.*

not unreasonable for the Agency to determine that it was appropriate to consider as one factor the sex of Mrs. Joyce in making its decision." *Id.* at 1455. Thus, as Justice O'Connor pointed out, the *Johnson* majority found the manifest imbalance requirement satisfied by the existence of the " 'inexorable zero.' " *Id.* at 1465 (O'Connor, J., concurring) (quoting *Teamsters v. United States,* 431 U.S. 324, 342 n. 23, 97 S.Ct. 1843, 1858 n. 23, 52 L.Ed.2d 396 (1977)).

In addition to finding the existence of a manifest imbalance, the majority in *Johnson* also found that the Santa Clara County plan did not unnecessarily trammel the rights of nonminorities. In emphasizing that the plan did not condone "blind hiring," the Court elaborated on the statistical analysis necessary to determine whether a manifest imbalance exists in a particular job category:

> [H]ad the plan simply calculated imbalances in all categories according to the proportion of women in the area labor pool, and then directed that hiring be governed solely by those figures, its validity fairly could be called into question. This is because analysis of a more specialized labor pool normally is necessary in determining underrepresentation in some positions. If a plan failed to take distinctions in qualifications into account in providing guidance for actual employment decisions, it would dictate mere blind hiring by the numbers, for it would hold supervisors to "achievement of a particular percentage of minority employment or membership ... regardless of circumstances such as economic conditions or the number of qualified minority applicants."

*Id.* at 1454 (quoting *Sheet Metal Workers' v. EEOC,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) (O'Connor J., concurring in part, dissenting in part)). Instead of authorizing such blind hiring, the Santa Clara County plan "expressly directed that numerous factors be taken into account in making hiring decisions, including specifically the qualifications of female applicants for particular jobs." *Id.* 107 S.Ct. at 1455.

Two circuit courts recently have construed *Johnson* in considering Title VII challenges to affirmative action plans. Unfortunately, what constitutes a manifest imbalance under *Johnson* remains unclear in the wake of the two courts' decisions. In *Higgins v. City of Vallejo,* 823 F.2d 351 (9th Cir.1987), the Ninth Circuit found permissible under Title VII and the fourteenth amendment an affirmative action plan justified in large part by a statistical comparison between the city's work force and its general population. In *Higgins,*

> [t]he City's affirmative action plan was passed after the California Fair Employment Practices Commission conducted an investigation of the City's employment practices and determined that minorities were conspicuously lacking in the City's work force. The FEPC's 1973 report found that while the City's population was approximately 30 percent minority, only 11.4 percent of the municipal work force was minority. Similarly, while approximately 17 percent of the population was black, only 7.3 percent of the municipal work force was black. The report also found that blacks earned considerably less money than whites. In addition, the FEPC report criticized the City for employing personnel practices that facilitated discrimination.

> The record also show[ed] a racial imbalance within the City fire department. The first black fire department employee was not hired until 1964. Between 1964 and the issuance of the FEPC report in 1973, only two other blacks received jobs with the fire department. Between 1972 and December 1983, forty-seven firefighters were hired, of whom only five were black. In that period, thirty-six individuals were promoted to fire captain; only one of these individuals was black. In the history of the fire department, only three blacks ... ha[d] ever held the position of firefighter/engineer.

*Higgins,* 823 F.2d at 356. Noting that the plan was adopted as a result of the FEPC's investigation, the Ninth Circuit concluded that the *Johnson* manifest imbalance standard was satisfied, even though none of the FEPC's statistical comparisons took into account the relevant *qualified* area labor

pool for firefighters or firefighter/engineers.

In *Hammon v. Barry*, 826 F.2d 73 (D.C. Cir.1987), in contrast, a divided District of Columbia Circuit held that a District of Columbia affirmative action plan violated Title VII because the city failed to satisfy the *Johnson* manifest imbalance requirement. The court in *Hammon* accepted the district court's finding that the city's fire department was officially segregated in the early 1950s, but held that the "substantial temporal gap between the time of the Korean conflict ... and the present day ... suggest[ed] that something more recent should serve as a predicate for remedial action right now." *Id.* at 77. The court then rejected the district court's additional finding, based upon a statistical comparison, that vestiges of the past discrimination still existed.

> Under *Johnson's* teaching, the percentage of blacks in the District's Fire Department is to be compared with the percentage of blacks in the area labor force. There should be no mistaking the correct benchmark in this case: the relevant labor force consists of persons 20 to 28 years of age in the *Washington metropolitan* area, not just within the confines of the Nation's Capitol. The reason is that it is undisputed that approximately half of the District's entry-level fighters have hailed from the suburbs. According to the 1980 census, only 29.3 percent of the statistically relevant metropolitan area population is black. In view of the fact that the Fire Department work force has a *greater* percentage of blacks than the area labor force, the District Court's conclusion that vestiges of discrimination remain in the Fire Department is plainly in error.

*Id.* at 77–78 (citations omitted) (emphasis in original). The D.C. Circuit thus declined "to engage in an entirely artificial comparison between the percentage of blacks in the District's fire department and its population." *Id.* at 78.

*Higgins* and *Hammon*, of course, may not be in conflict. In *Higgins*, the FEPC report reflected, in addition to the statistical disparities that alone would not have

justified an affirmative action plan, that blacks earned considerably less money than whites and that the city's personnel practices facilitated discrimination. Other evidence in the record also underscored that the city historically had hired very few blacks for fire department positions and that, once hired, very few blacks were promoted. Thus, the Ninth Circuit in *Higgins* considered more than just general-population statistical comparisons. In *Hammon*, on the other hand, the court considered a statistical comparison between the percentage of blacks in the District's fire department and the relevant qualified area labor pool that suggested the opposite of a manifest imbalance. The court in *Hammon* also considered other evidence that the city had been hiring blacks for entry level positions at an average rate of almost fifty percent since 1969 and seventy-five percent since 1981.

■ Whatever the inconsistencies, if any, of *Johnson's* progeny, its holding for our case is clear. In a case such as this one, in which the City has proffered no evidence of an "inexorable zero" and absolutely no other evidence of past discrimination, any proffered statistical comparison must establish a manifest imbalance between the relevant qualified area labor pool and the employer's work force. This is especially true in this case, where the City's Minority Hiring Task Force and its Minority Recruitment Review Committee both concluded that the City's hiring standards and practices were *nondiscriminatory* before recommending that the City hire pursuant to an affirmative action plan. Absent a statistical comparison that focuses on the relevant qualified area labor pool, there is no assurance that race is being taken into account "in a manner consistent with Title VII's purpose of eliminating the effects of employment discrimination." *See Johnson*, 107 S.Ct. at 1452.

South Bend's voluntary affirmative action plan, therefore, fails to pass Title VII muster. The ax falls because the statistical comparison upon which the city based its plan focused not on the relevant quali-

fied area labor pool but on general population statistics. If a job category requires that applicants possess minimum qualifications, the City's proffered statistical comparison must narrow its focus to those actually qualified for the position. Because the City here did not offer any evidence of a statistical disparity between the number of minorities in the fire department and the number of qualified minorities in the area labor pool, it failed to establish the manifest imbalance required by *Johnson.* The City, therefore, was not entitled to summary judgment that its plan did not violate Title VII.

### III.

In our previous opinion in this case, we departed from the general principle that a court should not reach a constitutional issue if it can dispose of the case on other grounds to consider whether the City's plan passed fourteenth amendment muster. 750 F.2d at 563. We noted that most courts that have addressed Title VII and fourteenth amendment challenges to affirmative action plans have analyzed both issues, that the courts' analyses of the two issues were similar, and that a decision on the merits of the equal protection challenge supported our decision on the Title VII issue. *Id.* For the same reasons, and because the Supreme Court has instructed us to consider both *Johnson* and *Wygant* on remand, we again consider Janowiak's equal protection challenge to the City's plan.

In *Wygant,* five Supreme Court Justices in three separate opinions held that a race-preferential layoff provision in a collective bargaining agreement between school teachers and the School Board of Jackson, Michigan violated the fourteenth amendment's equal protection clause. *Wygant,* 106 S.Ct. at 1852.[7] The provision, designed to safeguard the Board's affirmative action hiring goals, stated that in the event layoffs were necessary, a greater percentage of minority personnel could not be laid off than the current percentage of minority

personnel employed. *Wygant,* 106 S.Ct. at 1845.

Because there was no majority opinion in *Wygant,* the Court did not elaborate a clear constitutional standard applicable to all affirmative action plans. We have already noted, however, that a " 'lowest common denominator' majority position can be pieced together" from the *Wygant* opinions. *Britton v. South Bend Community School Corporation,* 819 F.2d 766, 768 (7th Cir.1987). We start with the benchmark standard agreed upon by the members of the majority (and apparently, according to Justice O'Connor, by all members of the Court): (1) the plan must be justified by a compelling government interest and (2) the means chosen by the government must be narrowly tailored to effectuate the plan's purpose. *See Wygant,* 106 S.Ct. at 1852 (O'Connor, J., concurring in part and concurring in the judgment).

According to *Wygant*'s three-Justice plurality, before a governmental unit can establish a compelling interest in remedying discrimination, it must make some showing of prior discrimination on its part. As Justice Powell wrote,

> [t]his Court never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of prior discrimination by the government unit involved before allowing limited use of racial classifications in order to remedy such discrimination.

*Id.* at 1847. Thus, Justice Powell wrote, "the relevant analysis in cases involving proof of discrimination by statistical disparity focuses on those disparities that demonstrate such prior governmental discrimination." In *Wygant,* therefore, "the proper comparison for determining the existence of actual discrimination by the school board was 'between the racial composition of [the school's] teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market.' " *Id.* at 1847 (citing *Hazelwood School District v. United States,* 433 U.S.

---

**7.** The views of the *Wygant* majority were expressed in a plurality and two concurring opin-ions. We believe that our analysis comports with all three opinions.

299, 307, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977)).  Because the School Board in *Wygant* proffered no such comparison, the plurality found that the Board had not established a compelling interest for its affirmative action plan and declined to give Jackson another chance to do so.  *Id.* 106 S.Ct. at 1849.[8]  Justice White, in his short, blunt concurrence, agreed with the plurality that

> [n]one of the interests asserted by the Board, singly or together, justify this racially discriminatory layoff policy....  Whatever the legitimacy of hiring goals or quotas may be, the discharge of white teachers to make room for blacks, none of whom has been shown to be a victim of discrimination, is quite a different matter.

*Id.* at 1857 (White, J., concurring).

Justice O'Connor, the fifth member of the *Wygant* majority, reserved the question whether a racially preferential layoff plan designed "to correct apparent prior employment discrimination against minorities while avoiding further litigation" might ever be constitutionally permissible. *See Britton*, 819 F.2d at 769 (citing *Wygant*, 106 S.Ct. at 1854, 1857 (O'Connor, J., concurring in part, and concurring in the judgment)).  Because she concurred in the judgment of reversal on the narrowest ground, her opinion is critical to our determination of *Wygant*'s lowest common denominator holding and our disposition of the present case. *See id.*, 819 F.2d at 769.

Justice O'Connor agreed with the plurality that "remedying past or present racial discrimination by a state actor is a sufficiently weighty state interest to warrant the remedial use of a carefully constructed affirmative action program," *Wygant*, 106 S.Ct. at 1853, and that "[t]his remedial purpose need not be accompanied by a contemporaneous finding of actual discrimina-

tion to be accepted as legitimate as long as the public actor has a firm basis for believing that remedial action is required." *Id.* To provide an example of a "firm basis" for remedial action, she stated that

> demonstrable evidence of a statistical disparity between the percentage of qualified blacks on a school's teaching staff and the percentage of qualified minorities in the relevant labor pool sufficient to support a prima facie Title VII pattern or practice claim by minority teachers would lend a compelling basis for a competent employer such as a School Board to conclude that implementation of a voluntary affirmative action plan is appropriate to remedy apparent prior employment discrimination.

*Id.* at 1856.  Justice O'Connor then implicitly found that the affirmative action *hiring* plan in *Wygant*, which the layoff provision was designed to protect, was not supported by a compelling government interest because the underlying plan "was tied to the percentage of minority students in the school district, not to the percentage of qualified minority teachers within the relevant labor pool." *Id.* at 1857.  Because the *layoff* provision was keyed to a hiring goal that was itself unrelated to remedying past employment discrimination, Justice O'Connor concluded that the plan could not be narrowly tailored to achieving its asserted remedial purpose. *Id.* at 1849.

■■■■ Thus, for our purposes, the lowest common denominator holding of *Wygant* is that a statistical comparison upon which an affirmative action plan is based must compare the percentage of minorities in employer's workforce with the percentage of minorities in the relevant qualified area labor pool before it can establish the predicate past discrimination required to justify an affirmative action remedy under

8.  The plurality also held that Jackson's plan was not narrowly tailored to achieving its asserted purpose.  The three Justices were especially troubled by the harsh effects of layoffs.  As Justice Powell wrote,

> [while] hiring goals impose a diffuse burden, often foreclosing only one of several opportunities, layoffs impose the entire burden of achieving racial equality on particular individuals, often resulting in serious disruption of their lives.  We therefore hold that, as a means of accomplishing purposes that otherwise may be legitimate, the Board's plan is not sufficiently narrowly tailored.

*Id.* 106 S.Ct. at 1851.

the fourteenth amendment.[9] We therefore hold that the City's plan here runs afoul of the fourteenth amendment's equal protection clause and that the district court erred in granting the City summary judgment. It is clear under *Wygant* that, at a minimum, the statistical comparison proffered by the City to justify its affirmative action program cannot focus on general population statistics alone. The City's comparison does just that.

The district court is therefore

REVERSED.

---

9. Other courts have reached the same conclusion. For example, in *J.A. Croson Co. v. City of Richmond*, 822 F.2d 1355 (4th Cir.1987), the Fourth Circuit held that Richmond's minority business utilization plan violated the equal protection clause. Under that plan, nonminority prime contractors were required to subcontract at least thirty percent of the dollar value of their public contracts to firms that were at least one-half minority owned. *Id.* at 1356. The Fourth Circuit rejected Richmond's proffered statistical evidence because it compared the percentage of contracts awarded to minority businesses with the total number of minority residents in the community. Noting that "general population statistics suggest, if anything, more of a political than remedial basis for the racial preference," the court stated that the appropriate comparison should have been between the number of contracts awarded to minority-owned businesses and the number of minority contractors, taking into account other variables such as experience and specialties. *Id.* at 1358–59.

Similarly, in *J. Edinger and Son, Inc. v. City of Louisville, Kentucky*, 802 F.2d 213 (6th Cir. 1986), the Sixth Circuit rejected a similar general-population statistical comparison proffered to justify preferences for minority-owned businesses, stating that "the City is required to show some statistical disparity between the percentage of qualified minority business contractors doing business in Jefferson County and the percentage of bid funds awarded to those businesses." *Edinger*, 802 F.2d at 216.

In *Higgins, supra*, the Ninth Circuit found that the FEPC's report justified the use of an affirmative action remedy under the fourteenth amendment. As we noted in our earlier discussion of that case, however, the Ninth Circuit found in the record before it evidence of prior discrimination in addition to the statistical comparisons, which we feel would have been inadequate standing alone.