WILLIAMS, Senior Circuit Judge,
concurring:
I join the court’s opinion painstakingly applying the key Supreme Court cases, Johnson v. Transp. Agency, Santa Clara, Cnty., 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), and United Steelworkers v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). I write separately to note that this area of the law continues to be rather amorphous and to call attention to a statistical problem disclosed by the record but not raised by the plaintiff on appeal.
Nearly three decades ago Judge Silber-man observed that he was “uncertain as to the meaning of ‘manifest imbalance.’ ” Hammon v. Barry, 826 F.2d 73, 81 (D.C.Cir.1987) (Silberman, J., concurring in denial of rehearing). I fully share that uncertainty, and would add that I have the same reaction to all of the key terms prescribed by the Supreme Court for assessing affirmative action plans under Title VII: whether there has been “manifest imbalance” in a “traditionally segregated job category,” and whether the plan “unnecessarily trammels the rights” of the persons disfavored. Court Op., 57. It may be that the Supreme Court selected these terms to assure that, without saying it in so many words, an employer can use race and gender for hiring or promoting minorities or women to the extent appropriate to assure that there is no “under-representation” — i.e., to amend any nontrivial deviation from proportionality to some more or less plausible applicant pool (at least so long as the employer can muster vague, generalized and/or hearsay assertions of past discrimination). This is not a *66 self-evident interpretation of Title VII’s directive that employers are not “to discriminate against any individual ... because of such individual’s race [or] sex.”
The effect is especially striking here: Shea neither challenged the district court’s ruling that his analysis of the State Department’s calculations was inadmissible, Court Op. 65, nor its ruling that the affirmative action plan’s repeated declarations of “manifest imbalance” were sufficient without expert provision of statistical support. See Shea v. Kerry, 961 F.Supp.2d 17, 51-52 (D.D.C.2013). The figures underpinning State’s plan consist mainly of numerical comparisons of various subgroups of Foreign Service employees (“Administrative,” “Professional,” “Clerical,” etc.) with a selected comparison group based on the “National Civilian Labor Force” data for various types of workers, e.g., “Public Administration Administrators and Officials.” Joint Appendix (“J.A.”) 209, 216. The description of the study in the record, J.A. 209, does not state what statistical test or standard of statistical significance the authors used, or indeed whether they used any statistical method at all. Certainly they do not suggest that they made an adjustment in the standard for statistical significance to account for the multiplicity of subgroups, as would be necessary if we assume that State was seeking to identify only “imbalances” not attributable to random chance. “When interpreting ... a table which summarizes results from a number of comparisons, one must bear in mind that when the number of comparisons is large [State’s report included hundreds], the probability may be substantial that at least one disparity with a P-value less than .05 will occur because of pure chance.” David C. Baldus & James W.L. Cole, Statistical Proof of Discrimination § 9.03 (Supp. 1987); see also id. at n.24a (“It is a mathematical fact that where 17 independent comparisons are to be tested, the probability of finding one or more to be statistically significant at the .05 level is .58, or almost 6 chances in 10.”).
Further impairing the value of the analysis is that many of the subsets are so small as to indicate a complete lack of intelligible criteria for State’s assertions of “manifest imbalance,” a term the report often uses but never explains. The report contains charts that split the workforce three ways (by occupational subgroup, ethnicity, and gender), and in one case it announces that it “reveals” a “manifest imbalance” of American Indian females (who represent 0.2% of the labor force comparison data) in the Finance Officer division, which employs only 125 people. J.A. 224-25. It seems improbable that any statistical test or standard of significance could yield evidence of a non-random “imbalance” for so small a subgroup. To the extent the report is suggesting that some purported “imbalances” could be amended by the hiring of a single employee of the right ethnicity and gender in the occupational unit in question, that response would, in turn, presumably create “imbalance” in another direction — thus appearing to undermine whatever criteria may have been used to define “manifest imbalance.” See, e.g., J.A. 218-19; 224-25. I recognize that Johnson is quite specific in stating that the proof of imbalance needed as a prerequisite for race- and gender-based affirmative action preferences is less than what is needed to establish a prima facie case of a Title VII violation, 480 U.S. at 632-33, 107 S.Ct. 1442, but an employer performing this exercise should at least be able to state its criteria for “manifest imbalance.”
The State Department in this respect sounds rather like the defendant university in Hill v. Ross, 183 F.3d 586, 591 (7th Cir.1999): “What the University appears to have in mind is a world in which the *67 absence of discrimination means that every department would exactly mirror the population from which its members are hired. But that is statistical nonsense.” In Hill, Judge Easterbrook went on to explain in detail what made the university’s theories nonsensical. Without close attention, Johnson’s seeming license to pursue proportionality in a workforce can dissolve into a license to pursue proportionality in almost any subset of the workforce.